IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. 8:26-cr-00134-LKG |
| | * | |
| JAMES GRIFFIN, | * | |
| | * | |
| Defendant | * | |
| | * | |

\*\*\*\*\*\*\*

## FACTUAL BASIS FOR PLEA

The United States and the defendant, **JAMES GRIFFIN**, agree that the allegations in the one-count criminal information and the following facts are true and correct and that, at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence.

### I.    Background

1.    The United States Postal Service ("USPS") was an independent agency of the Executive Branch of the United States Government and headquartered in Washington, D.C.

2.    Defendant **JAMES GRIFFIN**, a resident of the State of Michigan, was a contractor for COMPANY B, a packaging solutions company and corrugated box manufacturer headquartered in Michigan. **GRIFFIN** served as COMPANY B's national account manager and exclusive sales representative with the USPS. PERSON A assisted **GRIFFIN** with his work with COMPANY B. Between in or about 2018 and 2023, COMPANY B paid **GRIFFIN** approximately $1.5 million per year. **GRIFFIN** used portions of his yearly compensation from COMPANY B to pay PERSON A.

3.     JAMES E. LEE, JR., a resident of the State of Maryland, was the owner of LEE CONSULTING GROUP, LLC ("LCG"), a strategic and environmental consultant for the packaging industry. LCG was incorporated in Delaware on or about April 9, 2020.

4.     OFFICIAL A, a resident of the State of Maryland, was employed by the USPS from on or about July 15, 2000, until on or about May 28, 2024. OFFICIAL A served as an Expedited Packaging Specialist until on or about July 30, 2022, when OFFICIAL A was promoted to Product Management Specialist. OFFICIAL A and LEE were associates.

## II.     USPS Expedited Packaging Supplies

5.     The USPS provided expedited packaging supplies ("EPS") designed for use with its domestic and international priority mail express and priority mail services at no additional cost to customers. EPS included corrugated containers, envelopes, and a range of pressure-sensitive labels and decals. All EPS were preprinted with the logo of the corresponding USPS brand, to be easily identified in the mail stream, improving mail processing operations. The printed graphics and logo also acted as a promotional tool to build brand awareness among customers.

6.     The EPS program was managed by the USPS's Packaging Services team within the Shipping and Commerce Product Management Department. EPS was produced by third-party manufacturers that were contracted by the USPS to produce the materials to the designs and specifications of the Packaging Services team. The Packaging Services team also evaluated technical proposals and sample materials submitted by prospective suppliers and provided feedback to the USPS contracting officials for EPS contracts.

7.     As part of the USPS's procurement process, the assigned Contracting Officer often appointed a Contracting Officer's Representative ("COR") to handle the day-to-day administration

2

of the contract. The COR served as the USPS's point of contact with the supplier on all routine matters. A COR was responsible for the technical aspects of the project and for acting as the technical liaison with the supplier. The COR was also responsible for final inspection and acceptance of all reports and ensuring the performance of the contract was accomplished according to the contract. The COR had many other responsibilities, including contract management, payment responsibilities, budgeting, reporting on quality, safety and other performance aspects and various upward reporting responsibilities.

8.      OFFICIAL A's responsibilities included serving as the COR on several USPS contracts to provide EPS. OFFICIAL A also served as the chairperson or lead on several technical evaluation teams used by the USPS during the solicitation and procurement process to evaluate the technical aspects of bid proposals from prospective suppliers. The technical evaluation team chairperson is responsible for preparing the team's recommendation and submitting it to the Contracting Officer.

9.      Beginning no later than mid to late 2019, and continuing until in or about November 2023, in the District of Maryland and elsewhere, **GRIFFIN**, OFFICIAL A, LEE, and others known and unknown, did knowingly and willfully conspire to engage in bribery and honest services wire fraud.

10.      **GRIFFIN**, LEE, OFFICIAL A, and others agreed to engage in a corrupt scheme in which OFFICIAL A steered the procurement process for certain EPS contracts so they would be awarded to, or retained by, COMPANY B. OFFICIAL A steered the procurement process by, among other things: (a) providing preferential treatment and competitive advantages to COMPANY B, including reviewing draft bid proposals and disclosing to **GRIFFIN** confidential

USPS information regarding pricing and other issues; (b) using OFFICIAL A's position to perform official acts and advocate for, recommend, and influence other USPS officials to select COMPANY B for EPS contracts and modifications; and (c) using LEE and LCG as an intermediary for OFFICIAL A and COMPANY B to assist and conceal OFFICIAL A's efforts to steer the procurement process. OFFICIAL A was placed on retainer and agreed to perform, and did perform, official acts—and advised other officials, knowing and intending such advice to form the basis for official acts—on an as-needed basis for COMPANY B as opportunities arose. OFFICIAL A's official acts, and OFFICIAL A's efforts to influence other officials, benefited COMPANY B regarding the awarding, modifying, administering, and supervising of the USPS EPS contracts.

11.     In exchange, **GRIFFIN** retained and paid LEE and LCG to provide consulting services. In total, LEE and LCG received approximately $51,103 from COMPANY B (through **GRIFFIN**) for consulting services.

12.     In furtherance of the conspiracy and to effect its objects, **GRIFFIN**, LEE, OFFICIAL A, and others committed numerous overt acts in the District of Maryland and elsewhere, including the following examples:

13.     On or about September 12, 2019, **GRIFFIN** emailed COMPANY B executives regarding a draft bid proposal for a USPS contract. **GRIFFIN** stated in part:

> Just got off an hour long conversation with [OFFICIAL A] and [OFFICIAL A] gave me a lot of information – There are 15 Corrugated Suppliers involved in this bid including [two other competitors.] [OFFICIAL A's] guidelines for the highest we can be is Box 4 $ 195 / 1000[;] LFRB $ 465 / 1000[;] Box 7 $ 520 / 1000[.]
>
> My suggestions would be to look at $ 190 , $ 457 and $ 517 and see if you can live with those[.]  I'm not going to cut my commission

below 2 %[.]

14. On or about October 25, 2019, **GRIFFIN** emailed COMPANY B executives:

> I just talked with [OFFICIAL A] about the bid[.] [OFFICIAL A] said the technical evaluation is done and we scored very well – Pricing looks like this[:] #4 we are number 2[;] #7 we are number 3[;] LFRB we are number 2[.] [OFFICIAL A] doesn't know the exact numbers only the positions[.] There could be some adjustment for Geographical locations and technical factor scoring. [OFFICIAL A] thinks [a USPS procurement official] will give us a last chance within a week or so I'm guessing we should go down 5 % but it's your call -how low you really want to go[.] Jim

15. On or about December 6, 2019, **GRIFFIN** emailed COMPANY B executives

regarding COMPANY B's bid proposal, stating:

> I just got off the phone with [OFFICIAL A.] [OFFICIAL A] says Denver [referring to the USPS's contracting office location] will be contacting me next week for final pricing[.] [OFFICIAL A] really doesn't want [competitor] to stay in there - I believe [OFFICIAL A] and think [OFFICIAL A] is trying to help us[.] Box 4 we should be good if we drop 4%[.] LFRB looks like we need to be under 420 to have a shot[.] Box 7 is similar[.]
>
> It looks like on both of those we need to drop 5 %[.] Don't know if other guys will drop as well[.] [OFFICIAL A] thinks if we price at those levels we will at least get some of the biz[.] Our technical evaluation score was very high so we could get an award without having the lowest price[.] Let's talk Monday if possible[.] Thanks Jim

16. On or about December 9, 2019, **GRIFFIN** emailed COMPANY B executives

regarding COMPANY B's bid, stating: "My suggestion after talking with [OFFICIAL A] on

Friday night is we lower the prices[.] Box 4 (4%)[;] Box 7 (5%)[;] LFRB (6%)[.]" Let's talk

about it sometime today[.] [T]hanks Jim[.]"

17. On or about April 5, 2020, two days after **GRIFFIN** received notice that

COMPANY B has been awarded a portion of the USPS contract (with a minimum contract value

of $9,175,000 and a maximum contract value of $366 million), **GRIFFIN** exchanged text messages with PERSON A:

**GRIFFIN:**    I got official notification on Friday that we were awarded box 4[.]  Also we are alternate supplier on LFRB[.]  Only significant if primary suppliers fucks up or can't meet orders[.]  Box 7 we weren't even close[.]

* * *

**GRIFFIN:**    If the new guy fucks up we can save the day[.]  Done it before[.]

PERSON A:    Don't bitch with them.  Just keep doing what you do.  Look, once this is over, I know I'm fucked. [OFFICIAL A] isn't going to deal with me over [LEE]. I thought maybe I'd have a chance but I know once your [sic] out, I'm out.  I have other opportunities for jobs but nothing more than 45k a year but whatever. Eventually you're going to want to retire and I sure as hell know these fuckers aren't going to want me to take over for you[.]  So whatever I can do to help you while you want to work, let me know.  [OFFICIAL A's] probably going to do everything [OFFICIAL A] can to get [LEE] and [COMPANY A (a competitor)] into the mix and [COMPANY B] isn't helping making it harder for [OFFICIAL A]. (Assuming [COMPANY A] got those bids)[.]

**GRIFFIN:**    Actually I don't think it's that bad – [OFFICIAL A] asked me the other day how you are doing – [OFFICIAL A] knows I'm not here forever and I want to transition things to you if I can – [OFFICIAL A's] cool with that[.]

Also if [OFFICIAL A's] feeding [LEE] biz – [OFFICIAL A] can't give [LEE] all of it – [OFFICIAL A] will catch shit[.] So [OFFICIAL A] needs us in there to make things look legit.  [OFFICIAL A] knows -  In know what is going on and [OFFICIAL A's] going to do [OFFICIAL A] best to keep us rocking[.] I'm only pissed cuz I wanted 100 % but at the prices they went for – it would only be trouble[.] .  So I think things are OK[.]  Even if we only keep ½ of our bix for the next 7 yrs We'll be laughing[.]

18.    On or about July 1, 2020, at approximately 9:41 a.m., OFFICIAL A, using a personal cellphone, called **GRIFFIN** and had a conversation lasting approximately 15 minutes.

19.    On or about July 1, 2020, at approximately 2:35 p.m., LEE emailed **GRIFFIN**, attaching an LCG invoice for $9,500.  Approximately an hour later LEE texted **GRIFFIN**, stating

6

in part, "Jim, Hope you and the family are well.  Got up with [OFFICIAL A] and just sent you over the invoice.  Let me know if this works."

20.    On or about November 6, 2020, after **GRIFFIN** emailed LEE regarding a proposed project involving packaging tape, **GRIFFIN** texted PERSON A, stating: "I copied you on a [sic] email[.]  We are going to do a conference call with [LEE] tentatively on Nov 23 to discuss options for our USPS closure tape supplier.  It's a natural if you are working on this and [LEE] is too[.]  Great way for you to get into this stuff and get [OFFICIAL A] to approve[.]"

21.    On or about November 17, 2020, PERSON A and **GRIFFIN** exchanged texts:

PERSON A:    Hey what's up with [OFFICIAL A's] email?  Consultants?  Is that [LEE]?  Or just a different email[?]

**GRIFFIN:**    That's [LEE]

PERSON A:    …. that doesn't throw any red flags?

**GRIFFIN:**    Probably should but he was hired by [COMPANY A] to help them get the LFRB bid – now at least he's got a "consulting company"

PERSON A:    I gotcha.  Just asking, was just checking the date of our call.  I guess i thought he was hired by [COMPANY A]

**GRIFFIN:**    We are going to work with him to see if he can find another tape supplier at a lower price[.]  I'm just going along with it to keep [OFFICIAL A] happy

PERSON A:    Absolutely[.]  [I'm] just asking questions so I have an idea what's going on

**GRIFFIN:**    It's a whore's business[.]  I'm going to set up a call with you, me and [LEE] ([OFFICIAL A] will probably be listening in) Maybe for next week  Tuesday or so[.]  Will go over the tape specs , annual volumes , pricing needed with him and he can see what he can do[.]  Nobody else has had any luck so we got nothing to lose[.]

7

22.     Between in or about September 2020, and in or about March 2021, OFFICIAL A provided COMPANY B with confidential information, including pricing information for competitors' bid proposals, in connection with a USPS solicitation for express mail boxes.

23.     On or about December 28, 2020, at approximately 2:02 p.m., OFFICIAL A, using a personal cellphone, called **GRIFFIN**. The call lasted approximately 20 minutes.

24.     On or about December 28, 2020, at approximately 4:55 p.m., **GRIFFIN** emailed COMPANY B executives, informing them where COMPANY B's bid stood in comparison to other bidders on the USPS solicitation and proposing a modified bid with a different pricing structure. Thereafter, COMPANY B modified its bid proposal, including pricing information, and the USPS awarded the express mail box contract to COMPANY B on or about March 1, 2021. The contract's minimum value was $375,000, and its maximum value was $14.5 million. COMPANY B performed the contract.

25.     On or about March 9, 2021, at approximately 8:43 a.m., **GRIFFIN** called OFFICIAL A's personal cellphone. The call lasted approximately 13 minutes.

26.     On or about March 9, 2021, at approximately 10:38 a.m., **GRIFFIN** called LEE. The call lasted approximately 40 minutes.

27.     On or about March 10, 2021, LEE emailed **GRIFFIN**, attaching a $9,500 LCG invoice to Griffin and Associates, a consulting entity operated by **GRIFFIN**. **GRIFFIN** paid the invoice on or about March 29, 2021.

28.     Between in or about July 2021 and in or about January 2022, LEE assisted COMPANY B in obtaining contract renewals, including price increases, on two USPS contracts previously awarded to COMPANY B.

8

29.     On or about July 28, 2021, at approximately 8:03 a.m., OFFICIAL A, using a personal cellphone, called **GRIFFIN**. The call lasted approximately 20 minutes.

30.     On or about July 28, 2021, at approximately 9:09 a.m., **GRIFFIN** texted another COMPANY B official discussing the need to start working on USPS contract renewals. **GRIFFIN** stated in part, "OFFICIAL A wants us to do a negotiated contract renewal vs. going through the entire bid process. We will use [LEE's] consulting business to help us write up a formal proposal for the USPS[.]   I want you to be the point man with [LEE] while I deal with OFFICIAL A[.] That will keep things cleaner and will help you get established with [OFFICIAL A]."

31.     On or about July 28, 2021, at approximately 10:02 a.m., **GRIFFIN** emailed LEE, asking for LEE's assistance in obtaining the USPS contract renewals.

32.     On or about July 28, 2021, at approximately 10:24 a.m., **GRIFFIN** texted PERSON A, stating in part, "If you, me and [LEE] work together and are successful in getting contract renewals (with [OFFICIAL A's] approval) you will be part of it all moving forward[.]  We may have to keep paying [LEE] some bullshit $ fee but what the hell – who cares[.]"

33.     On or about September 8, 2021, LEE emailed **GRIFFIN** regarding the USPS contract renewals, stating in part: "After discussing with [OFFICIAL A], [OFFICIAL A] has advised now is the time to get this in the works."

34.     On or about October 1, 2021, after LEE and **GRIFFIN** shared draft contract extension proposals for which OFFICIAL A had provided input, LEE emailed **GRIFFIN** providing suggestions based on a meeting that LEE had that afternoon with the "senior consulting staff." The "senior consulting staff" was a reference to OFFICIAL A.

9

35.    On or about October 18, 2021, USPS contracting officials notified **GRIFFIN** that COMPANY B's contract would be modified and increased in both value and scope.

36.    On or about October 20, 2021, LEE emailed **GRIFFIN**, attaching a $9,275 LCG invoice to Griffin and Associates.  **GRIFFIN** paid the invoice on or about November 3, 2021.

37.    On or about October 26, 2021, on the same day that **GRIFFIN** emailed USPS contracting officials with a "cost savings proposal" for two of COMPANY B's contracts (and requesting to renew both contracts), OFFICIAL A and **GRIFFIN** texted each other.  OFFICIAL A indicated that [OFFICIAL A] would influence the other USPS officials.

38.    On or about October 28, 2021, OFFICIAL A texted **GRIFFIN**, stating that COMPANY B's proposal "looked pretty good[.]  I wonder why[?]"  **GRIFFIN** replied, "Ha. ha."

39.    On or about October 28, 2021, OFFICIAL A, using a government account, emailed the same USPS contracting officials expressing support of **GRIFFIN**'s cost savings proposal. Thereafter, between in or about November 2021 and in or about December 2021, OFFICIAL A emailed USPS contracting officials and advocated in support of renewing COMPANY B's contracts at a 20 percent cost increase.  USPS contracting officials ultimately extended both of COMPANY B's contracts (with the 20 percent increase recommended by OFFICIAL A) effective January 1, 2022.

40.    On or about November 2, 2022, OFFICIAL A and **GRIFFIN** had two telephone calls that lasted approximately seven and 31 minutes, respectively.

41.    On or about November 2, 2022, **GRIFFIN** emailed LEE, stating: "I spoke with [OFFICIAL A] [t]oday about starting to get you up and running on our bid project. . . ."  **GRIFFIN** also invited LCG (LEE) to visit COMPANY B's facilities in Michigan.

42.    On or about November 27, 2022, **GRIFFIN** emailed LEE with "a list of who we will be meeting with at [COMPANY B][.]" LEE traveled to Michigan to meet with COMPANY B representatives shortly thereafter and submitted an invoice to **GRIFFIN** on our about December 14, 2022.

43.    On or about February 21, 2023, LEE forwarded a message to himself. The forwarded message was a May 17, 2022, email from **GRIFFIN** to LEE in which **GRIFFIN** advised that the USPS intended to resolicit two of COMPANY B's expiring contracts. Of the upcoming solicitation, **GRIFFIN** wrote, "I think your help is most needed in the Technical Questions area : these are mostly summaries of how [COMPANY B] operates and how we fulfill or intend to fulfill the USPS needs." **GRIFFIN** concluded, "[W]e look forward to working with you and a successful outcome of this Bid."

44.    On or about April 14, 2023, **GRIFFIN** forwarded LEE an email from USPS contracting officials related to a solicitation for EPS Priority Mail and Priority Mail Express Boxes. **GRIFFIN** wrote in his email to LEE: "Here we go."

45.    On or about April 16, 2023, **GRIFFIN** emailed LEE and other COMPANY B representatives regarding the USPS solicitation and LEE's role with the bid proposal. Thereafter, between on or about April 17, 2023, and on or about April 28, 2023, LEE, **GRIFFIN**, and other COMPANY B representatives communicated frequently regarding COMPANY B's bid proposal.

46.    On or about May 9, 2023, OFFICIAL A texted **GRIFFIN**: "You may want to do 2 things[:]  1) Have [LEE] do a complete look over to make sure you get high scores[.] 2) send it Monday next week because [USPS contracting official] is out till then[.]  Just a thought[.]"

11

47. On or about May 10, 2023, OFFICIAL A, using a personal cellphone, called **GRIFFIN** and had a conversation that lasted approximately 69 minutes.

48. On or about May 10, 2023, **GRIFFIN** texted LEE, stating: "I just got off the phone with [OFFICIAL A]. Will be sending you our final (or almost final) draft of the responses to the Technical questions this afternoon for your review[.] I think everything is pretty damn good and can't imagine any of these yahoos doing a better job. LEE responded, "Agreed 100% I will get right on it."

49. On or about May 13, 2023, after receiving an email from **GRIFFIN** with COMPANY B's final bid proposal, LEE emailed **GRIFFIN** with proposed edits. **GRIFFIN** submitted COMPANY B's bid to a USPS contracting official two days later.

50. On or about June 2, 2023, at approximately 10:01 a.m., LEE called **GRIFFIN** and had a conversation that lasted approximately 69 minutes. At approximately 11:12 a.m., **GRIFFIN** attempted to call OFFICIAL A. At approximately 1:08 p.m., OFFICIAL A, using a personal cellphone, called **GRIFFIN** and had a conversation that lasted approximately 19 minutes.

51. On or about June 14, 2023, after **GRIFFIN** received an invoice from LEE and LCG, **GRIFFIN** made a payment to LEE and LCG totaling approximately $20,175.

52. On or about August 6, 2023, **GRIFFIN** emailed LEE, stating: "[OFFICIAL A] told me [OFFICIAL A's] saving up for a Elk hunt trip. Kind of a bucket list thing- We have Elk herds here in Northern Michigan and I completely understand. How about if we figure out a way to make sure [OFFICIAL A] gets [OFFICIAL A's] trip[.] If OK with you I could send you a bonus $$and you could use it to buy [OFFICIAL A's] trip - No need to tell [OFFICIAL A] where it came from other than it came from you[. . . .]"

53.    On or about August 10, 2023, **GRIFFIN** emailed LEE, stating: "The best and final pricing is due Wednesday August 16.  Keep your ear to the ground for any noises you might hear."

54.    On or about August 10, 2023, **GRIFFIN** texted PERSON A, stating in part: "Our best and final pricing has to be in next Wednesday[.]  So this thing is closed to getting wrapped up[.]  Jimmy hasn't seen the final pricing yet, so we don't know where we stand[.]"  Keep your fingers crossed, say a prayer, a Hail mary or whatever you do for luck.

55.    On or about August 11, 2023, **GRIFFIN** texted LEE, stating in part, "Let me know if you hear anything about our pricing[.]  This thing wraps up on Wednesday[. . . .]"  LEE responded, "You have time to talk on Monday?"  LEE and **GRIFFIN** scheduled a call for Monday morning at 10:00 a.m.

56.    On or about August 14, 2023, at approximately 10:00 a.m., LEE called **GRIFFIN** and had a conversation that lasted approximately 30 minutes.

57.    On or about August 14, 2023, at approximately 10:08 a.m., **GRIFFIN** called OFFICIAL A's personal cellphone and had a conversation that lasted approximately five minutes.

58.    On or about August 14, 2023, at approximately 12:00 p.m., **GRIFFIN** emailed a COMPANY B executive, advising that COMPANY B should stand down regarding its bid proposal until receiving "feedback" regarding bidding and pricing information.  **GRIFFIN** advised in subsequent emails that he was waiting to hear back from LEE with either "an update or no new info[.]"

59.    On or about August 16, 2023, shortly after **GRIFFIN** and COMPANY B submitted a revised bid proposal to USPS procurement officials, **GRIFFIN** texted OFFICIAL A:

**GRIFFIN:**    Just sent in my pricing. - Scraped the bottom of the barrel until it was shiny[.]  Total price reduction of 11.5 % from current[.]  Pretty good -you can continue to get

really good boxes and the best service on Earth and save a boatload of money at the same time[.]   That's a win -win[.]

OFFICIAL A: I got everything crossed on my body for you brother[.] That sounds good.

**GRIFFIN:**    Thanks pal!

OFFICIAL A: I think things will work out.

60.    On or about August 22, 2023, **GRIFFIN** texted with PERSON A:

PERSON A:    Thanks [**GRIFFIN**] ... and definite[.]  Would think [LEE] would give ya some kind of idea.

**GRIFFIN:**    [LEE] says it's going to be a while at least a couple weeks[.]  They haven't finished the write ups on the technical shit yet and those have to go to Denver and be reviewed . . . blah blah blah – I'm not sure anyone's even looked at the pricing yet[.] No hurry when you work for the Govt - actually it's the opposite of hurry[.] Take as much time as you can - Why be in a hurry to start saving $1 mil per month on your boxes[.]

61.    On or about August 24, 2023, **GRIFFIN** emailed a COMPANY B executive regarding COMPANY B's revised bid proposal:

> Just talked with [OFFICIAL A].  Said it will be a couple of weeks before decision is made[.]  [OFFICIAL A] still hasn't seen the pricing but said [OFFICIAL A] was told today by [USPS contracting official] that it is very competitive - so we didn't blow anyone away[.]  We are shining in the technical submission part[.] Smoked everyone in the Sustainability section – [OFFICIAL A] says that's really important right now[.]  I'll let you know when I hear more[.]

Thereafter, on or about December 20, 2023, the USPS awarded COMPANY B the contract, which had a minimum value of $30 million and a maximum value of $885 million.  COMPANY B performed the contract.

14

## III.    Other Relevant and Related Conduct

62.    On or about November 14, 2023, **GRIFFIN**, while in the State of Florida, participated in a voluntary telephonic interview with the FBI, while in the State of Michigan, that was surreptitiously recorded and conducted in connection with the FBI's federal criminal investigation.    During the interview, **GRIFFIN** made several materially false, fictitious, or fraudulent statement or representations, including the following:

a.    **GRIFFIN** had no contacts with OFFICIAL A regarding LCG;

b.    OFFICIAL A and LEE were diligent about keeping LCG's business and USPS official business separate and independent;

c.    **GRIFFIN** and OFFICIAL A did not discuss confidential USPS procurement information about specific contracts;

d.    OFFICIAL A did not help **GRIFFIN** with any USPS contracts;

e.    **GRIFFIN** did not believe that any information shared by LEE came from OFFICIAL A;

f.    **GRIFFIN** and LEE did not have conversations with the expectation that LEE would share procurement information with OFFICIAL A or solicit procurement information from OFFICIAL A and relay it to **GRIFFIN**; and

g.    **GRIFFIN** was not familiar with COMPANY A or one of COMPANY A's affiliated companies.

63.    In truth and in fact, **GRIFFIN** knew these statements were false when made, and he knowingly and willfully made them for the purpose of obstructing, impeding, and impairing the FBI and federal grand jury investigation.

64.    On or about November 17, 2023, three days after **GRIFFIN** participated in a voluntary interview with the FBI, GRIFFIN was informed about the pending federal grand jury investigation and received a federal grand jury subpoena for documents.    The subpoena sought,

15

among other things, communications and text messages with OFFICIAL A. After receiving the subpoena, **GRIFFIN** knowingly and willfully deleted approximately 89 text messages between himself and OFFICIAL A for the purpose of obstructing, impeding, and impairing the FBI and federal grand jury investigation.

## IV.    Conclusion

65.    This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or the United States, and it is not intended to be a full enumeration of all the facts surrounding the defendant's case.

66.    The actions of the defendant as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Date: 6/2/2026

Edward P. Sullivan
Acting Chief, Public Integrity Section
U.S. Department of Justice

16

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, James Griffin, and the United States, I hereby stipulate that the above Factual Basis for Plea is true and accurate and that, had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
James Griffin
Defendant


We are James Griffin's attorneys. We have carefully reviewed the above Factual Basis for Plea with him. To our knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Matthew L. Vicari, Esq.
Stephen J. van Stempvoort, Esq.,
Andrew C. Goetz, Esq.
Aaron Zelinsky, Esq.
Counsel for James Griffin

17